## JAMES CARTY *v.* WILLIAM P. JARRETT, SHERIFF CITY AND COUNTY OF HONOLULU.

### EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

ARGUED AUGUST 21, 1912.                    DECIDED SEPTEMBER 6, 1912.

### ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

ESTOPPEL—*nature of representation essential to constitute an estoppel in pais.*

   A representation in order to give rise to an estoppel need not necessarily have been made directly to the person claiming the estoppel with the intention that he in particular should act upon it. It is enough that it was made under such circumstances as would warrant the assumption that the party making the representation must have understood that one knowing of it might reasonably believe it to be true and act upon it. A representation may consist of acts and conduct as well as of words, but in any case, in the absence of a fraudulent intent, the act, conduct or words must have been so clear, definite and unambiguous as to cause one, as a reasonable person, to form a belief of an existing fact.

SAME—*when question of law.*

   When the facts which are claimed to constitute an estoppel are undisputed the question whether an estoppel exists is one of law.

Carty v. Jarrett, 21 Haw. 274.

Costs—*liability of sheriff for.*

> In an action of replevin brought against a sheriff to recover property held by him under a writ of attachment issued in an action between private persons where the plaintiff obtains judgment the costs may be taxed against the defendant.

OPINION OF THE COURT BY ROBERTSON, C.J.

This is an action of replevin to recover possession of five certain horses held by the defendant under a writ of attachment issued from the circuit court of the first judicial circuit in an action of assumpsit there instituted by the Club Stables, Limited, against H. Hordorn on the 30th day of June, 1911. The verdict was for the plaintiff for the restitution of the horses, and $64 damages. It appeared in evidence that the horses in question which were included in a shipment of animals arrived at Honolulu by steamer from San Francisco in charge of said Hordorn on June 27th. Upon their arrival the animals were placed in quarantine at the government corral pursuant to requirements of the regulations of the territorial board of agriculture and forestry, division of animal industry. The writ of attachment was served by the sheriff on July 7th, but the horses remained at the government corral in charge of the quarantine officials until the expiration of their term of quarantine. The plaintiff claimed ownership of two of the horses by purchase from one McWayne through Hordorn on July 5th, and, as to the other three, by bill of sale from one Nakamoto who claimed to have purchased them from McWayne through Hordorn on the same date. There was evidence sufficient to justify the jury in finding that the horses belonged solely to McWayne; that Hordorn was merely in McWayne's employ and had no interest in the horses, but that Hordorn was authorized to sell the horses and to sign McWayne's name when necessary, with instructions to deposit any moneys received through any sale to McWayne's credit. There had been no delivery, actual or constructive, of the horses to Carty or Nakamoto. The questions whether Hor-

dorn had any ownership in the horses, and whether the sales to Carty and Nakamoto were executed and complete or merely executory or conditional were left to the jury under proper instructions, and we cannot disturb their findings as to those points.

The theory of the defendant was and is that the evidence (which was undisputed) that McWayne had consigned the horses to Hordorn and McWayne and had caused them to be listed with the quarantine officials under the names of Hordorn and McWayne constituted a holding out or representation that Hordorn was a joint owner with himself of the animals; that the Club Stables corporation was justified in acting upon the representation; that it did rely on the representation, in connection with other facts which will be noted, in causing the attachment to be levied on the animals; that as no delivery had been made to the alleged purchasers the attachment was good as against them; that McWayne is estopped to deny the truth of the representation; and that Carty and Nakamoto are also bound by the estoppel.

There was no evidence in the case that either Carty or Nakamoto were aware of the representation upon which the Club Stables, Limited, claimed to have acted. The receipts given them for the moneys paid on account of their respective purchases were signed "McWayne by Hordorn." But, assuming that in the absence of any delivery of the horses to the purchasers the intervening attachment might have been effective, it will be noticed that the contentions of the defendant have for their basis the alleged estoppel against McWayne. If there was no estoppel there is nothing to support the defendant's theory.

The testimony showed that in a conversation between McWayne and Hordorn at the former's home on the Island of Hawaii the parties agreed to engage in a joint venture having for its object the purchase on the mainland of mules for importation to and sale in this Territory; that each party was to furnish a like sum of money and would share equally any profits

or losses; that Hordorn had no ready money but would provide it after arrival on the mainland; that upon this understanding the parties proceeded to California and Oregon, McWayne paying Hordorn's travelling and hotel expenses; that Hordorn failed to furnish any money, being unable, evidently, to do so; that McWayne told Hordorn that under the circumstances it would not be fair to share the probable profits, saying that "that part of it was off;" that Hordorn said he was willing to do anything and that if McWayne would give him a suit of clothes once in a while and provide him with food he would be willing to take whatever McWayne might give him at the conclusion of the venture; that McWayne replied "I will do what is right by you;" that Hordorn received some money and a suit of clothes from McWayne; and that after the arrival of the horses at Honolulu McWayne gave Hordorn five hundred dollars for his services.    The testimony further showed that McWayne bought some horses and mules and sent them from San Francisco by steamer to Honolulu in charge of Hordorn as above stated; that the animals were subjected to the mallein test at San Francisco by the officials of the United States department of agriculture, bureau of animal industry, with whom they were listed in the names of "Hordon and McWayne." McWayne testified in effect that, as he intended to take passage by a subsequent steamer and would not reach Honolulu until after the arrival of the animals, he had listed and shipped the animals in their joint names in order that Hordorn should have no difficulty in his (McWayne's) absence in taking the necessary steps with reference to the landing of the animals at Honolulu and their care and control.    It appears that McWayne arrived at Honolulu on the 6th or 8th of July.    It was also in evidence that prior to leaving for the mainland McWayne told certain persons at Kailua, Hawaii, that he and Hordorn were going to purchase stock. Mr. Bellina, the president of the Club Stables corporation, testified that he had heard that McWayne and Hordorn had gone to the mainland together to buy stock; that he knew, when he

caused the issuance of the writ of attachment, that stock had arrived in Honolulu in the names of Hordorn and McWayne, and that the animals had been tested in San Francisco and entered at quarantine in Honolulu in the names of Hordorn and McWayne; that he had heard that Hordorn had put $4000 or more into the venture; and that he believed that Hordorn had a one-half interest in the animals. He did not claim to have received any of this information from McWayne. On these facts we think that McWayne was not estopped from denying that Hordorn was a joint owner of the animals and from claiming sole ownership in himself. There being no conflict in the evidence the question whether an estoppel has been proven is one of law.

A representation in order to give rise to an estoppel need not necessarily have been made directly to the person claiming the estoppel with the intention that he in particular should act upon it. It is enough that it was made under such circumstances as would warrant the assumption that the party making the representation must have understood that one knowing of it might reasonably believe it to be true and act upon it. A representation may consist of acts and conduct as well as of words, but in any case, in the absence of a fraudulent intent, the act, conduct or words must have been so clear, definite and unambiguous as to cause one, as a reasonable person, to form a belief of an existing fact. In the nature of things each case must stand largely on its own facts, and it will serve no useful purpose to review the many cases cited in the defendant's brief, some of which at first sight perhaps tend to support the claim of an estoppel in this case, but we think they will be found upon examination to be consistent with the view we have adopted. The testimony of McWayne appears to us to contain a consistent and satisfactory reason for consigning and listing the animals in the names of Hordorn and McWayne, and if this be so, it shows that such consigning and listing does not necessarily amount to a declaration of joint ownership of the animals by the persons whose

names have been so used. .It is consistent with the fact of ownership in one of the persons named, and, indeed, is not neces-- sarily inconsistent with ownership in a stranger. Under such circumstances it cannot be said that the representation amounts to such a clear and unambiguous statement that the property is jointly owned as would justify one in assuming it to be such and acting on it. The placing of one's property in the possession of another is an ambiguous act. It may indicate a change of ownership, but it is nevertheless consistent with the retention of ownership. One's rights of ownership are not lost or impaired because he has loaned or rented his property to another person, nor because he has sent it to another place in charge of a servant.

From what has been said it is apparent that an exhaustive review of the many exceptions is unnecessary. If any error occurred in instructing the jury on the subject of constructive delivery or as to the question of estoppel and its effect on plaintiff's claim of ownership, it was, under the circumstances, harmless, as upon the undisputed facts we find the defendant's claim of estoppel to be untenable.

Costs were taxed against the defendant in the court below in the sum of $41.50, including the costs of court, attorney's costs, and witness' fees. The defendant excepted to this, and urges that the case is within the statute (Sec. 1, Act 63, Laws of 1907) which provides that no officer "acting in his official capacity on behalf of the Territory or any County or Municipality thereof shall be taxed costs" etc. The contention cannot be sustained. The defendant, in attaching the horses, acted in his official capacity; he holds possession of them in that capacity; and he is sued in this action as sheriff of the city and county of Honolulu; but in levying the writ and taking and holding possession of the animals he did not act on behalf of the Territory or the municipality, but on behalf of a private corporation, the Club Stables, Limited. The case does not fall within the statute. The costs were properly taxed.

All of the exceptions have been considered and they are over-ruled.

*W. B. Lymer* (*Thompson, Wilder, Watson & Lymer* on the brief) for plaintiff.

*E. C. Peters* for defendant.